QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert P. Feldman (Bar No. 69602)
  bobfeldman@quinnemanuel.com
  David Myre (Bar No. 304600)
  davidmyre@quinnemanuel.com
  Eliyahu Ness (Bar No. 311054)
  eliness@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California  94065-2139
Telephone:   (650) 801-5000
Facsimile:   (650) 801-5100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Meredith M. Shaw (Bar No. 284089)
  meredithshaw@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA  94111
Telephone:   (415) 875-6600

*Attorneys for Plaintiff*
*Oakland Bulk & Oversized Terminal, LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| OAKLAND BULK & OVERSIZED TERMINAL, LLC | CASE NO.  3:16-cv-07014-VC |
| Plaintiff, | FIRST AMENDED COMPLAINT |
| vs. | |
| CITY OF OAKLAND, | |
| Defendant. | |

Plaintiff Oakland Bulk & Oversized Terminal, LLC ("OBOT" or "Plaintiff") alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff OBOT brings this action to correct the Oakland City Council's unconstitutional abuse of its power.

2.     OBOT seeks declaratory and injunctive relief against the enforcement of Oakland Ordinance No. 13385 (the "Ordinance") and Resolution No. 86234 (the "Resolution"), which prohibit the transportation and export of coal and petroleum coke ("petcoke") to and through OBOT's rail and marine terminal currently in development on city land at the port of Oakland.  The Ordinance and Resolution are unconstitutional under the Commerce Clause of the United States Constitution and preempted by United States statutes, including the Interstate Commerce Commission Termination Act, the Hazardous Materials Transportation Act, and the Shipping Act of 1984.

3.     In agreements including a Development Agreement dated July 16, 2013, Oakland granted OBOT the right and obligation to re-develop land at the former Oakland Army Base.  This includes the right to develop a rail and marine terminal on that portion of the former Oakland Army Base commonly known as the West Gateway (the "Terminal").  The Terminal would transfer shipments of bulk commodities from rail carriers to ships for export to foreign countries through the deep water port at the former Oakland Army Base.  Bulk commodities are non-

1   containerized materials such as coal, iron ore, soda ash, copper, grain, limestone,

2   petroleum, cement and gravel.[1]

3       4.      Bulk commodities will be delivered to the Port of Oakland rail yard by

4   Class I rail carriers.  To carry the bulk commodities from the rail yard to the

5   Terminal, OBOT is constructing a rail line and will operate a rail carrier.  This rail

6   carrier is known as Oakland Global Rail Enterprise, LLC ("OGRE"), an affiliate of

7   OBOT.

8       5.      OBOT is currently negotiating with Terminals and Logistics Solutions,

9   LLC ("TLS") with respect to the financing, construction, and operation of the

10  Terminal.  The TLS transaction would result in transportation of various bulk

11  commodities to and through the Terminal.  One bulk commodity that TLS may

12  handle is coal, which would be shipped by rail from Utah to the Terminal for export

13  by ship.

14      6.      As set forth more fully herein, coal and petcoke provide a substantial

15  amount of this nation's energy needs, are transported by rail throughout the United

16  States and are exported in large quantities to other countries.

17      7.      In recent years, environmental groups have increased their opposition

18  to coal and petcoke because of their impact on global climate change when burned

19  for fuel.  The Terminal will not burn coal; rather, coal will be transported to the

20  Terminal by rail and loaded onto ships for export without any burning of coal.

---

[1] The Cambridge Business English Dictionary defines "bulk goods" as "goods such as coal, grains, oil, or chemicals that are not packaged in any type of container and are stored, transported, and sold in large quantities." (http://dictionary.cambridge.org/us/dictionary/english/bulk-goods, last visited December 7, 2016; *see also* http://dictionary.reference.com/browse/bulk, last visited December 7, 2016 ("bulk" defined as "goods or cargo not in packages or boxes, usually transported in large volume, as grain, coal, or petroleum").

Nevertheless, facing pressures from environmental interest groups opposed to the use of coal globally, the Oakland City Council embarked on a campaign to ban the transport and export of coal and petcoke to and through Oakland—and specifically at the Terminal.

8.     The campaign culminated in 2016, with Oakland's passing of the Ordinance and Resolution.  The Ordinance and Resolution impose a complete ban on the transportation and export of coal and petcoke to and through the Terminal.

9.     The purpose and effect of the Ordinance and Resolution are to regulate the transport and export of coal and petcoke.

10.     The justifications for the ban imposed by the Ordinance and Resolution and the purported benefits of the Ordinance and Resolution are illusory.  The Ordinance and Resolution impose a burden on interstate and foreign commerce, are clearly excessive in relation to the purported local benefits, are not based on evidence of a substantial danger to residents of Oakland and neighbors or users of the Terminal, and there are less restrictive measures that can and do control the purported health effects that are the purported basis of the Ordinance and Resolution.

11.     Accordingly, the Ordinance and Resolution violate the Commerce Clause of the United States Constitution, and are preempted by federal statutes including the Interstate Commerce Commission Termination Act, which vests the exclusive power to regulate rail transportation in the Surface and Transportation Board of the United States (not the City of Oakland); the Hazardous Materials Transportation Act, which vests the United States Secretary of Transportation (not

the City of Oakland) with the authority to determine what materials warrant "hazardous" designations and restrictions or prohibitions in interstate and intrastate transportation; and the Shipping Act of 1984, which prohibits discrimination in shipping of the kind required by the Ordinance.  Because the Ordinance and Resolution violate these federal laws, as described below the Ordinance and Resolution also breach the Development Agreement.

12.     The passage of the Ordinance and Resolution have materially and substantially harmed OBOT, including by diminishing the value of OBOT's rights pursuant to the Development Agreement and diminishing the value of its investment in the West Gateway, imposing on OBOT substantial out-of-pocket costs to mitigate the harm from Oakland's unconstitutional exercise of its power, and interfering with OBOT's ability to attract partners and investments for the West Gateway project.

13.     OBOT thus respectfully seeks declaratory, injunctive, and any other appropriate relief against the application of the Ordinance and Resolution to the construction and operation of the Terminal.

## PARTIES

14.     Plaintiff OBOT is a California limited liability company with a principal place of business located at 300 Frank H. Ogawa Plaza, Suite 340, Oakland, CA 94612.

15.     Defendant City of Oakland is a public entity and California charter city located in Alameda County, California (hereinafter, "Oakland" or the "City").

1

## JURISDICTION AND VENUE

2      16.     This Court has subject-matter jurisdiction over the claims asserted in

3 this action pursuant to 28 U.S.C. § 1331 (federal question) because Claim 1 of

4 OBOT's complaint asks this Court, pursuant to 42 U.S.C. § 1983, to interpret and to

5 apply the Commerce Clause, and Claim 2 of OBOT's complaint asks this Court,

6 pursuant to 42 U.S.C. § 1983, to interpret and to apply the ICCTA, Hazardous

7 Materials Transportation Act and Shipping Act of 1984.

8      17.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367

9 over the parallel claim for breach of contract asserted in Claim 3 of OBOT's

10 complaint because it arises out of the same case or controversy as Claims 1 and 2.

11      18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)

12 because Defendant City of Oakland is located within the District.  This Court is also

13 a proper venue pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the

14 events giving rise to the claim occurred in the District, where a substantial part of

15 the property affected by the regulations at issue is also located.

16      19.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and

17 2202 (declaratory judgment), 28 U.S.C. § 1651(a) (injunctive relief), and 42 U.S.C.

18 § 1983 (declaratory and injunctive relief available for Commerce Clause violations).

19

## INTRADISTRICT ASSIGNMENT

20      20.     Pursuant to Civil L.R. 3-5(b) and Civil L.R. 3-2(c)-(d), there is a basis

21 for assigning this civil action to the San Francisco Division or Oakland Division, as

22 a substantial part of the events giving rise to the claims occurred in Alameda

23 County.

24

1

## FACTUAL BACKGROUND

2        21.  From 1944 to 1999, the waterfront area just south of the eastern

3  entrance to the San Francisco-Oakland Bay Bridge was a U.S. Army facility known

4  as the "Oakland Army Base".  The Oakland Army Base was a major generator of

5  jobs and other economic benefits for the West Oakland region before its September

6  30, 1999 closure pursuant to the U.S. Department of Defense's Base Realignment

7  and Closure Commission.  Following its closure, approximately 200 acres of the

8  Oakland U.S. Army Base were transferred to the adjacent Port of Oakland, while the

9  remaining 170 acres known as the "Gateway Development Area" were transferred

10  to the City of Oakland.

11        22.  Facing the loss of local jobs and other economic benefits from the

12  closure of the Oakland Army Base, the City adopted a "Redevelopment Plan for the

13  Oakland Army Base Development Project" to facilitate the "redevelopment,

14  rehabilitation, and revitalization" of the Gateway Development Area (as amended,

15  the "Redevelopment Plan").  Its "major goals" included, among other things, the

16  "strengthening of the economic base of the community by the construction and

17  installation of infrastructure" to "stimulate new development, employment, and

18  social and economic growth".  To achieve its goals the Redevelopment Plan did not

19  present "specific proposals," but instead "present[ed] a process and a basic

20  framework" within which the City could "fashion, develop, and proceed with . . .

21  specific plans, projects and solutions".  The Redevelopment Plan granted the City

22  authority to sell or lease real property in the Gateway Development Area for

23  "redevelopment of [the] land by private enterprise".

24

23.   In 2008, after numerous proposed projects for redevelopment of the Oakland Army Base failed, the City issued a Request for Qualifications seeking plans from private developers to "transform the [Gateway Development Area] into a mixed use commercial and/or industrial development".

24.   Thirteen developers submitted proposals, including California Capital & Investment Group, Inc. ("CCIG").  CCIG is the sole member of OBOT.

25.   At all times, CCIG and then OBOT clearly communicated to the City, including in project documentation, its plan to build a rail and marine terminal for bulk and oversized cargo at the West Gateway.  The City was aware that coal was one of the bulk commodities that could be transported through the Terminal.

26.   For example, in October 2011 a potential sublessee of the Terminal, Kinder Morgan, gave a presentation to City officials that discussed how coal constituted 34% of the "bulk tonnage" Kinder Morgan shipped.  In June 2012, CCIG provided to city officials a video that included a depiction of coal shipments from a similar terminal in Long Beach, California.  In January 2013, Port of Oakland officials exchanged emails about their discussion with Oakland City officials regarding the possibility for coal shipments at the Oakland Army Base.  Finally, a May 2013 study commissioned by the Port of Oakland included coal in its "suggested list of commodities" that could be shipped from the Oakland Army Base.

27.   After dozens of duly noticed public hearings, two written agreements were executed with the City:  (1) the Lease Disposition and Development Agreement (as amended, the "LDDA") and (2) the Development Agreement

Regarding The Property And Project Known As The "Gateway

Development/Oakland Global", effective July 16, 2013 (as amended, the "DA").

28.   The LDDA was originally entered into by the City, the Oakland

Redevelopment Successor Agency ("ORSA") and Prologis CCIG Oakland Global,

LLC ("Prologis/CCIG").  Prologis/CCIG is a joint venture between an affiliate of

Prologis, Inc. and CCIG.  On or about June 13, 2014, City, Prologis/CCIG and

OBOT entered into that certain Partial Assignment and Assumption (West Gateway)

of the Lease Disposition and Development Agreement (the "WGW Partial

Assignment") whereby OBOT succeeded to all of Prologis/CCIG's rights and

obligations under the LDDA with respect to the West Gateway.

29.   The DA was originally entered into between the City and

Prologis/CCIG.  Pursuant to Section 10.1 of the DA, Prologis/CCIG's rights and

obligations under the DA with respect to the West Gateway were automatically

assigned to OBOT upon the execution of the WGW Partial Assignment by the City,

Prologis/CCIG and OBOT confirming OBOT as a permitted assignee under the

LDDA with respect to the West Gateway.

30.   Neither the LDDA nor the DA impose any restrictions preventing the

transport of coal or petcoke through the Terminal.  Neither agreement limit the type

of bulk commodities that could be exported from the Terminal.  As an Assistant

City Administrator stated in a February 3, 2016 "Status Report On Coal":

In 2013, the City Council adopted a Development Agreement (DA) for the

Bulk Commodities Terminal at the Army Base West Gateway Parcel.  This

agreement vested rights to the developer (CCIG) to operate the facility

under the current set of laws at the time of adoption, with limited

exceptions.  ***No specific restriction or prohibition on coal was made part of***

***that agreement.***  There is a narrow exception related to health and/or safety

(Section 3.4.2 of the DA).  (emphasis added).

31.   In particular, Section 3.4 of the DA specified that only "Existing City

Regulations" as of the adoption of the DA would "govern the development of the

Project and all Subsequent Approvals with respect to the development of the Project

on the Project Site".  The only exception to this express contractual promise is

Section 3.4.2 of the DA:  the City could apply health and safety regulations adopted

after July 16, 2013, to the Terminal only if (a) the application of any such health and

safety regulation is "otherwise permissible pursuant to Laws"—"Laws" being

defined to include the "Constitution of the United States, and any codes, statutes,

regulations, or executive mandates thereunder"; and (b) the "City determines based

on substantial evidence and after a public hearing that a failure to do so would place

existing or future occupants or users of the Project, adjacent neighbors, or any

portion thereof, or all of them, in a condition substantially dangerous to their health

or safety".[2]

32.   Following the execution of the DA, OBOT invested years of effort and

millions of dollars in planning the development of the Terminal.

33.   For example, OBOT has spent millions of dollars and thousands of

man-hours removing existing structures at the project site, building the

---

[2]   Certain other narrow exceptions exist which allow the City to apply new regulations to the project, but none of those exceptions applies here.

– 9 –

1   infrastructure required to support the anticipated Terminal (including the rail line to

2   the Terminal), and implementing environmental safeguards for use both during

3   construction and future operations at the Terminal.  To date, OBOT and its affiliates

4   have invested well in excess of $10 million on these development efforts.

5          34.   As part of the development process, OBOT began to search for a

6   company to construct and operate the Terminal.  In the spring of 2014, OBOT

7   entered negotiations with TLS.

8          35.   The negotiations eventually resulted in a November 2014 Exclusive

9   Negotiation Agreement and Sublease Option between OBOT and TLS (the

10  "Sublease Option").  The Sublease Option granted TLS an exclusive option to

11  sublease and operate the Terminal for a sixty-six (66) year period.  Consistent with

12  the City-approved DA and industry practice for such facilities, the Sublease Option

13  did not restrict the shipment of coal or any other commodity to and through the

14  Terminal.

15         36.   Beginning in 2014, facing political pressure including from

16  environmental groups Oakland City Council members decided to prohibit the

17  transportation and shipment of coal and petcoke to and through the Terminal before

18  reviewing the evidence of its local health and safety impacts—or lack thereof—or

19  holding a genuine public hearing.  This is reflected in statements and events that

20  took place after the execution of the DA and before the purported public hearings

21  held in September 2015, and June 2016, including but not limited to the following:

22
        a.  On June 17, 2014—two years before the Ordinance and Resolution of
23
            2016 were adopted—the Oakland City Council unanimously passed
24

1    Resolution No. 85054, a "Resolution to Oppose Transportation of

2    Hazardous Fossil Fuel Materials, Including Crude Oil, Coal, and

3    Petroleum Coke, Along California Waterways, through Densely Populated

4    areas, through the City of Oakland".  This resolution, which recited the

5    Council's opposition to the transportation of commodities including coal

6    and petcoke through Oakland was introduced by Councilmembers Kalb,

7    Gibson, McElhaney and Kaplan.  Councilmembers Brooks, Gallo, Gibson,

8    McElhaney, Kalb, Kaplan, Reid, Schaaf and then-President Kernighan

9    voted in favor of the resolution.  On information and belief, there was not

10   even the semblance of study or a public hearing before this resolution was

11   passed.

12   b. On or about May 4, 2015—one year before the Ordinance and Resolution

13   of 2016 were adopted—Oakland Councilwoman Lynette Gibson

14   McElhaney released a signed press release entitled "OAKLAND SAYS

15   'NO!' TO COAL SHIPMENTS AT THE OAKLAND ARMY BASE".

16   Therein, Councilwoman McElhaney stated:  "Lynette Gibson McElhaney,

17   President of the Oakland City Council, is unequivocal in her opposition to

18   coal being exported from City-owned lands, '. . . .  [I]t is not the type of

19   economic development that we want - no thank you!'"  Councilwoman

20   McElhaney continued:  "The Oakland City Council, and the Port Board of

21   Commissioners have already taken stances against coal exports,

22   specifically:  • In February of 2014, the Board of Port Commissioners

23   rejected a proposal to ship coal from one of their terminals.  • In June of

24

– 11 –

1    2014, Councilmember McElhaney and her colleagues passed a resolution

2    opposing the transport of coal, oil, petcoke (a byproduct of the oil refining

3    process) and other hazardous materials by railways and waterways within

4    the City".

5    c.  On or about May 14, 2015, Councilmember Abel J. Guillen posted on

6    social media (under his Instagram moniker, "babocinco") a photograph of

7    a large banner stating:  "NO COAL IN OAKLAND" with the caption:

8    "No Coal in #Oakland! #savetheplanet #savetheearth #environment1st

9    #environmentaljustice".



d.  On May 11, 2015, Oakland Mayor Libby Schaaf wrote to CCIG CEO, Phil

Tagami:  "I was extremely disappointed to once again hear Jerry Bridges

[President of TLS] mention the possibility of shipping coal into Oakland at

the Oakland Dialogue breakfast.  Stop it immediately.  You have been

awarded the privilege and opportunity of a lifetime to develop this unique

piece of land.  You must respect the owner and public's decree that we

– 12 –

1
2
3
4

      will not have coal shipped through our city. . . . Please declare definitively

      that you will respect the policy of the City of Oakland and you will not

      allow coal to come through Oakland.  If you don't do that soon, we will all

      have to expend time and energy in a public battle . . . ."

5
6
7

    37.   After the foregoing events and statements, the City Council began the process of holding a series of sham public hearings on an ordinance to ban coal and petcoke from Oakland.  The first such hearing took place in September, 2015.

8
9
10
11
12

    38.   Among the parties who contributed to the September 2015 hearing was the Bay Area Air Quality Management District ("BAAQMD").  BAAQMD regulates non-vehicular sources of emissions into the air in the Bay Area.  At the September 2015 hearing, BAAQMD's representative did not support a ban on coal shipments but rather adopted a "neutral position".

13
14
15
16
17

    39.   BAAQMD encouraged the City Council "to implement all feasible mitigations" such as covering rail cars and conveyors involved in transporting coal. BAAQMD did not provide any evidence that coal or petcoke shipments posed a substantial health or safety danger or that a total ban was required for health and safety.

18
19
20
21

    40.   On May 3, 2016, the Oakland City Council passed a resolution acknowledging that analysis and review of the potential impacts of coal and petcoke required "multi-disciplined expertise" and "specialized and additional expertise" that the City Council and its staff did not have.

22
23
24

    41.   Accordingly, the City Council retained private consultant Environmental Science Associates ("ESA") to selectively review the record

1  compiled to date and to create findings that would appear to support a finding of

2  "health and/or safety impacts" of transporting bituminous coal, fuel oils, gasoline,

3  crude oil and petcoke through the Terminal.

4        42.  The retention of ESA and the subsequent public hearing to review the

5  ESA Report were a sham—an attempt by the City Council to give the appearance of

6  weighing the evidence concerning coal and petcoke, even though the City Council

7  had already decided to ban the transport of coal and petcoke through the Terminal.

8        43.  As Councilmember Kalb stated at the May 3 hearing, the retention of

9  ESA was part of a "multi-pronged effort" in which ESA would work with City Staff

10  and a staff person whom Kalb had hired on a temporary basis "to get us to a place

11  hopefully by the end of June where we'd be able to take appropriate action and have

12  the ability under the rules and under the provision of the development agreement to

13  take serious action".

14        44.  Councilmember Noel Gallo was even more direct at the May 3 hearing:

15  he expressed concern that the retention of ESA would further delay the vote on

16  banning coal and said that he was "ready to vote no on the coal".

17        45.  On or about Thursday, June 23, 2016, ESA issued its "Report on the

18  Health and/or Safety Impacts Associated with the Transport, Storage, and/or

19  Handling of Coal and/or petcoke in Oakland, Including at the Proposed Oakland

20  Bulk and Oversized Terminal in the West Gateway Area of the Former Oakland

21  Army Base" (the "ESA Report").

22        46.  On Friday, June 24, 2016, the City for the first time publicly released

23  proposed drafts of the Ordinance and Resolution.  At the same time the City also

24

released an Agenda Report prepared by City staff (the "Staff Report") that recommended the adoption of the Ordinance and Resolution and which was purportedly based on an evaluation of the ESA Report completed one day earlier and of public letters and opinions submitted to the City regarding coal and petcoke, including other reports purporting to analyze those submissions.

47.   On June 27, 2016, three days after the ESA Report was issued to the City (including two weekend days) the City Council held a hearing and voted to ban coal and petcoke in the Ordinance and Resolution.  On information and belief, no city councilmember fully analyzed and understood the 163 page ESA report in that amount of time, and no city councilmember asked any questions of ESA at the June 27 hearing.

48.   The ESA Report separated its findings with respect to the potential "health effects" of coal, "safety effects" of coal and "climate effects" of coal.  With respect to the purported "health effects" of transporting coal, the ESA Report merely concluded that the rail transportation and storage and handling of coal, taken together, **"*could* impact the health of adjacent neighbors from the expected increase** into the ambient air in the form of total suspended particulates and fine particulates (TSP, $PM_{10}$, and $PM_{2.5}$) . . . ."  (emphasis added).

49.   Even these speculations by ESA about what "could" happen are unsupported.  Nothing in the ESA Report or any other report or submission purportedly evaluated by the City Council and its staff provides a basis for a ban on coal or petcoke by the City of Oakland.

50.    The ESA Report relies principally on estimates of particulate matter ("PM") emissions resulting from the transportation of coal and petcoke.  $PM_{10}$ and $PM_{2.5}$ are standard metrics for measuring PM found in the air.  PM is not unique to coal and petcoke:  a large number of other sources produce PM including, for example, windblown soil, vehicle exhaust, grain storage, and woodburning fireplaces.

51.    Thus, any activity—including shipping commodities other than coal or petcoke to and through the Terminal—could increase the levels of PM in the air.

52.    Neither the ESA Report nor any other report or submission purportedly evaluated by the City Council or its staff addresses whether coal and petcoke release more PM than other bulk commodities that might be shipped through the Terminal.

53.    The ESA Report divided its emission estimates between "Rail Transport" (the period when the coal would be in transit in a rail car) and "OBOT Operations" (the period when the coal would be unloaded, stored, transferred and transloaded into ships after arriving at the Terminal).  These estimates are contained in Table 5.7 of the ESA Report:

1

2

| TABLE 5-7 SUMMARY OF EMISSIONS ESTIMATES FROM RAIL TRANSPORT, STAGING/SPUR TRAVEL, UNLOADING, STORAGE, TRANSFER AND SHIP LOADING OF COAL AT OBOT | | | | | | |
|---|---|---|---|---|---|---|
| | tons/yr | | | lbs/day | | |
| Fugitive Coal Dust Emissions Source | TSP | PM₁₀ | PM₂.₅ | TSP | PM₁₀ | PM₂.₅ |
| **Rail Transport*** | | | | | | |
| BAAQMD | 2,102 | 988 | 148 | 12,012 | 5,646 | 847 |
| Oakland | 82 | 38 | 6 | 468 | 220 | 33 |
| So Emeryville | 35 | 17 | 3 | 203 | 95 | 14 |
| San Leandro | 98 | 46 | 7 | 562 | 264 | 40 |
| Staging at Port Railyard, Rail Spur Trip to OBOT | 156 | 78 | 18 | 889 | 445 | 67 |
| SUBTOTAL - Oakland | 238 | 116 | 18 | 1,357 | 665 | 100 |
| **OBOT Operations** | | | | | | |
| Unloading | 11.9 | 5.7 | 0.9 | 66.0 | 31.2 | 4.7 |
| Storage | 3.2 | 1.5 | 0.2 | 17.7 | 8.4 | 1.3 |
| Transfer | 10.4 | 4.9 | 0.7 | 57.6 | 27.2 | 4.1 |
| Transloading | 11.9 | 5.7 | 0.9 | 66.0 | 31.2 | 4.7 |
| SUBTOTAL | 37.5 | 17.7 | 2.7 | 207.3 | 98.1 | 14.8 |
| PROJECT TOTAL – Oakland | 276 | 134 | 21 | 1,564 | 763 | 115 |
| * Uncontrolled air emissions of fugitive dust from open coal filled rail cars.. | | | | | | |

54.   ESA's estimates of "TSP" are irrelevant for all practical purposes:  TSP is not regulated, and measurements of TSP are not relied upon in assessments of air quality, not even in the ESA Report.

55.   ESA's estimates of $PM_{10}$ and $PM_{2.5}$ emissions from the unloading, storage, transfer and/or transloading of coal at the "OBOT Operations" were not supported by evidence.

56.   The Terminal and its emission controls have not yet been fully designed, much less constructed.  Accordingly, it is impossible to specify the precise amount of possible emissions that might be associated with the proposed Terminal.

57.   Nonetheless, ESA did not provide a range of estimated potential emissions from the Terminal but instead purported to estimate the precise level of emissions.

1      58.   ESA provided no detail or back up or any indication of the numerical

2   inputs it used to reach the values in Table 5-7.

3      59.   On information and belief, no set of inputs grounded in fact would

4   support the values set forth in Table 5-7 of the ESA Report.

5      60.   ESA does not appear to have taken into account in Table 5-7 the

6   emission levels of two terminals in California that transport coal or petcoke.

7      61.   The terminal at the Port of Pittsburg is a multiple commodity terminal,

8   which stores and ships petcoke.  ESA does not appear to have taken into account the

9   Pittsburg terminal's emission values in the values it reported in Table 5-7 of the

10  ESA Report.  ESA did not explain this omission.

11     62.   The terminal at the Port of Long Beach is a multiple commodity

12  terminal, which stores and ships coal and petcoke.  ESA does not appear to have

13  taken into account the Long Beach terminal's emission values in the values it

14  reported in Table 5-7 of the ESA Report.  ESA did not explain this omission.

15     63.   Consistent with the proposed design of the Terminal, the Pittsburg

16  terminal and the Long Beach terminal are either totally enclosed or partially

17  enclosed and otherwise covered.  The reported emissions for these facilities are far

18  lower than the values predicted by ESA for the Terminal.

19     64.   On information and belief, the Pittsburg terminal and the Long Beach

20  terminal operate pursuant to permits from their respective Air Quality Management

21  Districts.  These Districts regulate air quality pursuant to delegation from the State

22  of California.

23

24

65.   On information and belief, the Pittsburg terminal publicly reported emissions of 0.1 tons a year of $PM_{10}$ and 0.1 tons a year of $PM_{2.5}$;  these emissions are based on a total throughput of 500,000 tons of petcoke per year.

66.   On information and belief, the Long Beach terminal publicly reported emissions of 0.8 tons per year of $PM_{10}$ and 0.2 tons per year of $PM_{2.5}$; these emissions are based on a total throughput of approximately 1.7 million tons of coal per year.

67.   The emissions rates in paragraphs 65 through 66 reflect emissions rates at similar enclosed and/or covered terminals, and are well below the emissions rate assumed in the ESA Report.

68.   The ESA Report does not contain any explanation about why the enclosures and/or covers of the Pittsburg or Long Beach terminals would not work at the Terminal.  Neither the ESA Report nor any other report or submission purportedly evaluated by the City Council or its staff contains any explanation about why they did not assume emissions rates comparable to the Pittsburg and Long Beach terminals.

69.   The EPA has delegated certain regulatory authority regarding air quality to the states.  The State of California has delegated regulatory responsibility for air pollution from non-vehicular sources to Air Quality Management Districts. In the nine county Bay Area, this regulatory body is BAAQMD.

70.   The ESA Report acknowledges that the "Bay Area Air Quality Management District (BAAQMD)" is "the regional agency responsible for air pollution control in San Francisco Air Basin (Bay Area) . . . . "

1    71.   No BAAQMD rule or regulation requires a ban on the transportation of

2  coal or the proposed activities at the Terminal.

3    72.   For any new source of emissions in the Bay Area, BAAQMD has

4  established thresholds over which it considers an increase in emissions "significant".

5  With respect to $PM_{10}$, BAAQMD considers a new source of emissions significant if

6  it emits over 15 tons of $PM_{10}$ per year.  With respect to $PM_{2.5}$, BAAQMD considers

7  a new source of emissions significant if it emits over 10 tons of $PM_{2.5}$ per year.

8    73.    On information and belief, the increase in PM emissions from the

9  operations at the Terminal, whether or not coal and petcoke were permitted, would

10  be approximately ten times less than what BAAQMD considers significant.

11    74.   Pursuant to BAAQMD Regulations, the Terminal would be required to

12  obtain an operational permit.  The permit would be conditioned on installation of

13  Best Available Control Technology (BACT).   On information and belief, BACT

14  includes control measures such as enclosures, baghouses, wind screens, spillage

15  control for conveyors, and water sprays.

16    75.   Storage domes and enclosed conveyors are currently used in coal and

17  petcoke facilities, including in the Bay Area.  The ESA Report so states and

18  recognizes these mitigation measures would be regarded by BAAQMD as "Best

19  Available Control Technology".  ESA does not state that it took these measures into

20  account in calculating the values in Table 5-7.  On information and belief, ESA did

21  not do so.

22    76.   The installation of BACT will ensure that PM emissions at the

23  Terminal are negligible.

24

1      77.   On or about October 5, 2015, BAAQMD wrote to the City Council:

2  "Air District staff is available to meet with City staff and assist in the evaluation of

3  Terminal Logistics Solutions' proposed mitigation measures and discuss additional

4  measures.  As Air District staff stated at the Sept. 21 hearing, potential air quality

5  emissions and impacts to public health from the proposed Project include fugitive

6  dust and equipment engine emissions.  Dust emissions can be reduced through

7  aggressive containment of all aspects of material handling – rail cars, conveyers,

8  storage piles, etc."  Such containment is planned for the Terminal and related

9  activities.  On information and belief, ESA did not take these containment measures

10  into account in Table 5.7 and did not address or explain why it rejected BAAQMD's

11  views on these containment measures.

12      78.   On information and belief, neither the ESA Report nor any other report

13  or submission purportedly evaluated by the City Council or its staff addresses or

14  explains why BAAQMD's permit requirements and the installation of BACT would

15  be insufficient.

16      79.   The ESA Report failed to address that the South Coast Air Quality

17  Management District (SCAQMD) adopted a regulation known as Rule 1158 at least

18  in part to regulate the Long Beach terminal.  Nothing in the ESA Report or any

19  other report or submission purportedly evaluated by the City Council or its staff

20  addresses, much less establishes, that there is any substantial danger to neighbors or

21  users of the Long Beach terminal as it is operating today.  Nothing in the ESA

22  Report or other evidence addresses why the Terminal, if the requirements of Rule

23

24

1   1158 were applied to it, would result in any substantial danger to neighbors or users

2   of the Terminal or other residents of Oakland.

3       80.   The Pittsburg and Long Beach terminals are not the only facilities in

4   California that handle coal or petcoke.  As the ESA Report acknowledges, "In the

5   San Francisco Bay area all of the five refineries produce petcoke" which is a

6   "commonly exported commodity".   The ESA Report contains no indication of the

7   emissions levels from these facilities.  The ESA Report contains no indication of

8   any adverse health consequences from these facilities.

9       81.   As set forth herein, the City is prohibited by the United States

10   Constitution and federal law from regulating rail transportation.

11       82.   Even if the City could lawfully regulate rail transportation, ESA's

12   estimates for PM emissions from Rail Transport were explicitly based on an

13   assumption of "uncontrolled air emissions of fugitive dust from open coal filled rail

14   cars".  There was no basis for this assumption.

15       83.   In fact, potential coal dust emissions from rail cars transporting coal to

16   the Terminal could be controlled by measures such as rail car covers and/or

17   surfactants (spray-on adhesive coating that is routinely employed in rail transport for

18   the purpose of preventing fugitive dust releases).  ESA cited no evidence that such

19   measures would not work.

20       84.   Further, on information and belief, even with respect to uncovered rail

21   cars the rate of coal dust emissions decreases rapidly as the rail car begins to travel.

22   As a result, PM emissions from a rail car travelling through Oakland would be

23   significantly less than any such emissions at the departure point.

24

FIRST AMENDED COMPLAINT

1       85.   On information and belief, ESA relied upon numerical values

2 concerning emission rates for uncovered rail cars at the departure point and assumed

3 that rate would be constant along the entire trip.  The currently projected starting

4 point for coal shipments to the Terminal is Utah—almost a thousand miles from

5 Oakland.  There was no basis for the ESA Report or any other report or submission

6 purportedly evaluated by the City Council or its staff to use emissions rates at the

7 departure point in Utah to predict emissions from trains moving in Oakland.

8       86.   Once operational, commodities will arrive at the Terminal from the

9 interstate rail system as follows:

    a.  "Class I" rail carriers will transport commodities to the Port of Oakland Rail Yard.

    b.  Once the commodities arrive at the Rail Yard, the Class I rail carriers will transport the commodities from the Rail Yard to the Terminal via the rail carrier known as OGRE.

    c.  The rail cars that OGRE will move from the Rail Yard to the Terminal belong to the Class I rail carriers.

    d.  OGRE will be paid by the Class I rail carriers to move these rail cars.

    e.  At any time, the Class I carriers will be entitled to undertake the Rail Yard to Terminal transportation directly.

      87.   Once commodities arrive at the Terminal, they will be transloaded from the rail carrier through the Terminal to ships for shipment to other states or export to foreign countries.  Transloading is an integral part of the interstate rail system.  It includes handling the commodities, loading and unloading them, possibly storing them temporarily, and transferring them from the rail carrier through the terminal to the ships.

1    88.    With respect to the "safety effects" of coal and petcoke, the ESA

2    Report asserted merely that fires have occurred at coal piles and in rail cars of

3    unspecified contents in unspecified conditions, and that coal fires can present a

4    danger to persons in close proximity to them, such as firefighters.  The ESA Report

5    identified no evidence, however, that a coal fire is likely to occur at the Terminal or

6    in rail cars carrying coal to or through the Terminal in Oakland.

7    89.    The ESA Report provided no evidence of a coal fire ever occurring at

8    any of the coal rail terminals cited in the Report.

9    90.    In particular, neither the ESA Report nor any other report or

10   submission purportedly evaluated by the City Council or its staff contains any

11   evidence that there has been a fire at the Long Beach Terminal or the Pittsburg

12   terminal, which use covers and/or enclosures.

13   91.    ESA did not consider any evidence regarding mitigation measures for

14   fire safety.

15   92.    With respect to the climate effects of coal and petcoke, the ESA Report

16   commented on greenhouse gases solely because it was mentioned by public

17   commenters during the public hearing process:  "Because numerous public

18   commenters noted the contribution of the greenhouse gas emissions of coal when

19   combusted by the end user overseas, this study also includes a review of those

20   comments".

21   93.    The ESA Report states that air pollutants emitted from the use of coal

22   and petcoke overseas may be carried over the ocean to Oakland.  On information

23

24

1   and belief, because of the relevant meteorological conditions, there will be no or

2   negligible air quality impact to Oakland from the burning of coal overseas.

3       94.    The ESA Report states that the coal shipped through the Terminal and

4   combusted overseas could increase greenhouse gas levels globally.  On information

5   and belief, the size of any increase in greenhouse gasses from the use of the

6   quantities of coal that would be exported through the Terminal would be on the

7   order of 0.01 percent (one one-hundredth of one percent) of the global total.

8       95.    The ESA Report concludes that the resulting incremental rise in sea

9   level "would be experienced locally in Oakland".  Neither the ESA Report nor any

10  other report or submission purportedly evaluated by the City Council or its staff

11  contain any substantial evidence to support this conclusion.  The size of the increase

12  in global greenhouse gas levels, as alleged in the previous paragraph, would not be

13  perceptible in Oakland.

14      96.    Apart from the ESA Report, the Staff Report (on which the Ordinance

15  and Resolution purport to rely) purports to have evaluated a report by Zoe Chafe

16  regarding the transportation of coal and petcoke (the "Chafe Report").

17      97.    In or around November 2015, City Councilmember Kalb issued a

18  solicitation and proposed scope of work entitled "Evaluation of Health and Safety

19  Impacts of the Proposed Bulk Coal Terminal on the Former Oakland Army Base

20  Adjacent to the Port of Oakland".

21      98.    Councilmember Kalb's solicitation resulted in the retention of Zoe

22  Chafe to prepare a report that purported to review the evidence regarding coal and

23  petcoke.

24

99.     As the November 2015 solicitation suggested, the retention of Chafe was an attempt to by the City Council to give the appearance of weighing the evidence concerning coal and petcoke, even though the City Council had already decided to ban the transport of coal and petcoke to and through the Terminal irrespective of the evidence.

100.    That solicitation made clear that a balanced and objective review of the evidence was not expected.  The solicitation stated that the person to be retained would review the record from the September 2015 hearing on coal and petcoke and produce a document that would contain, if applicable, "a series of findings that can be used to support the application of public health or safety regulations pursuant to section 3.4.2 of the development agreement".

101.    While Chafe was preparing her Report, and shortly before the Oakland City Council passed the resolution to retain ESA on May 3, 2016, Vice Mayor and City Councilmember Anne Campbell Washington received an email from her chief of staff that provided a path to the adoption of the Ordinance and Resolution. Among other things, the email stated that "The only way to vote on June 21 [to ban coal and petcoke] is if ESA process is dispensed altogether.  We can rely on the report that Zoe Chafe is preparing and that independent public health panel will prepare".

102.    The email to Councilmember Campbell was written on April 30, 2016; the Chafe Report was not completed until June 22, 2016.  The fact that the City Council and its staff believed that it could "rely" on the Chafe Report before it was completed reflects that the Report was not an objective review of the evidence.

1        103.   The Chafe Report is not supported by substantial evidence.

2        104.   For example, with respect to purported health effects, the Chafe Report

3    states that the Terminal presents a health risk because "[t]here is no safe level of

4    exposure to $PM_{2.5}$" and the Terminal will release $PM_{2.5}$.   As set forth in paragraph

5    51 above, **any** operations at the Terminal or West Gateway would and currently do

6    release $PM_{2.5}$, whether or not involving coal or petcoke.

7        105.   The Chafe Report states that emissions from the burning of coal may

8    cause cancer.   As set forth in paragraph 7 above, there will be no burning of coal in

9    connection with the Terminal.

10       106.   Chafe's assertion that coal fires may expose people to carcinogenic

11   toxins is based on studies regarding prolonged exposure to fumes from cooking food

12   using solid fuels such as coal.  These conditions are inapplicable to people in the

13   vicinity of the Terminal, even assuming a coal fire occurred at some point.

14       107.   Chafe's assertions regarding the health effects of coal on workers at the

15   Terminal assume that conditions at the Terminal would be the same as those in a

16   coal mine.  There is no basis for this incorrect assumption.

17       108.   The conditions at the Terminal, like the conditions at the Pittsburg and

18   Long Beach terminals, would not be similar to coal mines in any material respect.

19       109.   Workers at the Terminal will be equipped with protective equipment as

20   required by the National Institute for Occupational Safety and Health including

21   personal respiratory protection.  Chafe assumes, without evidentiary support, that

22   the protective equipment would not work.  Neither the Chafe Report nor any other

23   report or submission purportedly evaluated by the City Council or its staff cites any

24

1    evidence that workers at the Long Beach and Pittsburg terminals do not use

2    protective equipment or are otherwise exposed to health risks.

3        110.   Chafe asserts that PM will be released from the Terminal by  "Rail cars

4    being transported through Oakland", "Rail cars in terminal (bottom-dump)", "Open

5    rail cars" and "Open storage areas".

6        111.   There will be no "Open rail cars" and no "Open storage areas" at the

7    Terminal, and any dust emitted from the "bottom-dump" railcars would be

8    contained within the fully enclosed Terminal.

9        112.   With respect to coal fires and explosions, Chafe asserts that "even if

10   safety protocols are followed" the transportation of coal to and through the Terminal

11   presents a "substantial risk" of "substantial damage from fires and explosions".

12   Chafe did not cite any evidence regarding mitigation measures for fire safety or

13   attempt to explain why those mitigation measures would not work.

14       113.   In particular, the Chafe Report contains no evidence that there has been

15   a fire at the Long Beach or Pittsburg terminals, which use covers and/or enclosures

16   and employ fire mitigation measures.

17       114.   The assertion in the Chafe Report and in other reports and submissions

18   purportedly evaluated by the City Council or its staff that coal poses a substantial

19   risk of fire/explosion during transport, including by spontaneous combustion,

20   despite all safety precautions, contradicts the Secretary of Transportation's

21   designation of coal as safe for transportation.

22

23

24

1    115.   Chafe's conclusions regarding the global climate effects of coal

2    exported from the Terminal are not supported by evidence for the same reasons

3    alleged in paragraphs 94 through 95 above.

4    116.   The purpose, intent and effect of the Ordinance and Resolution is to

5    regulate the transportation by rail and by ship of coal and petcoke.

6    117.   By completely banning coal and petcoke activities at the Terminal, the

7    Ordinance and Resolution make it impossible to ship or transport coal to or through

8    Oakland for export.

9    118.   The fact that the Oakland City Council's intent was to prohibit rail

10   transportation and shipping of coal and petcoke is reflected in the ESA Report and

11   other reports and submissions purportedly evaluated by the City Council or its staff.

12   In particular, ESA's estimated emissions of both $PM_{10}$ and $PM_{2.5}$ from the "OBOT

13   Operations" are only 13% of ESA's estimated total emissions for "all activities

14   associated with OBOT for the export of coal" (*i.e.*, from "Rail Transport" and

15   "OBOT Operations" combined).  Other reports purportedly evaluated by the City

16   Council or its staff similarly relied principally upon the estimates of PM emissions

17   from coal and petcoke associated with rail transport and not from operations at the

18   Terminal.

19   119.   The fact that the Oakland City Council's intent was to prohibit rail

20   transportation and shipping of coal and petcoke is also reflected by the exemptions

21   from the scope of the Ordinance and Resolution of local coal and petcoke operations

22   unrelated to transportation:  specifically exempted from the ban are (a) non-

23   commercial facilities located in Oakland, and (b) commercial manufacturing

24

1   facilities located in Oakland where coal and petcoke are consumed on-site.  The

2   ESA Report states that these activities emit pollutants that can have impacts on

3   health and on the environment and provides no basis for distinguishing between

4   these activities and transportation activities.

5        120.   Oakland City Councilmembers expressly stated that they enacted the

6   Ordinance and Resolution precisely to prevent the rail transportation and shipping of

7   coal and petcoke to and through Oakland.  For example:

8        a.  On June 28, 2016, shortly after the votes on Ordinance No. 13385 and
            Resolution No. 86234, Councilmember Abel Guillen posted a link to an
9            article on social media declaring: "Oakland bans *coal shipments*";

10       b.  In a July 31, 2016 email, Councilmember Rebecca Kaplan sought
            donations for her re-election campaign by touting her role in "banning the
11           *shipment* and storage of coal";

12       c.  In an August 23, 2016 post, Councilmember Lynette Gibson McElhaney,
            discussing her bid for re-election, similarly emphasized that during her
13           time on the City Council, Oakland "**Banned *coal exports*".

14       121.   The statements by these City Councilmembers, and others, reflect

15  reality:  If the Ordinance remains in place, no rail carrier will ship coal to Oakland

16  for export because there would be no way to move the coal from the rail carrier to

17  the ships.  Since no rail carrier could bring coal to Oakland, ships likewise could not

18  transport coal for export.

19       122.   The exclusive Sublease Option OBOT negotiated with TLS, as

20  described in paragraph 35 above, was set to earn both OBOT and the City of

21  Oakland millions of dollars over the 66-year life of the sublease.  The transaction

22  was based, in part, on TLS's expectation that it could select the bulk commodities to

23  be shipped to and through the Terminal without restriction.

24

123. The passage of the Ordinance and Resolution significantly diminished the value of the Sublease Option, causing TLS not to exercise its option and instead to seek to renegotiate the payment terms of the proposed sublease at substantially less advantageous terms for OBOT.

124. Accordingly, the passage of the Ordinance and Resolution have materially and substantially harmed OBOT, including by diminishing the value of OBOT's rights pursuant to the DA and diminishing the value of its investment in the West Gateway, imposing on OBOT substantial out-of-pocket costs to mitigate the harm from Oakland's unconstitutional exercise of its power, and interfering with OBOT's ability to attract partners and investments for the West Gateway project, all of which threaten the viability of the Terminal.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Unconstitutionality Under the Commerce Clause**

125. OBOT realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 124, above.

126. According to the U.S. Energy Information Administration (the "EIA"), more than one billion short tons of coal were produced by U.S. coal mines in aggregate in 2014. The U.S. is a substantial user of coal, both for electric power and a variety of other commercial, institutional, and industrial purposes. For example, in 2015 more than 1.7 billion short tons of coal were used nationwide.

127. On information and belief, coal is mined in 25 states of the United States (but not California), and nearly 70% of coal delivered in the United States is

1  transported by rail for at least some portion of its journey.  The Department of

2  Transportation's "Freight Facts and Figures" show that as of 2013, coal remained

3  the sixth most shipped commodity by weight in the U.S., with more than 1.2 billion

4  tons transported that year.

5      128.   The United States is also a large beneficiary of international trade in

6  coal, reportedly exporting approximately 75 million short tons of coal in 2015 alone.

7  On information and belief, more coal is exported from the West Coast of the United

8  States than any other non-containerized commodity.

9      129.   The proper and efficient functioning of the system for transportation of

10  commodities including coal and petcoke by rail requires a uniform transportation

11  infrastructure and regulations throughout the country and would be defeated by a

12  patchwork of local regulations.

13      130.   The Ordinance and Resolution significantly impair the federal interest

14  in an efficient and uniform system of transportation of commodities in interstate and

15  foreign commerce by effectively prohibiting all shipments of coal and petcoke to

16  and through the Terminal.  The loading, unloading, transloading, transferring,

17  storage and/or other handling of coal and petcoke are necessary and inextricable

18  parts of that uniform system of interstate shipment of coal and petcoke by rail and

19  export by ship—particularly at a rail-to-ship terminal, where the primary function is

20  to transfer bulk material such as coal and petcoke from rail to ship for international

21  export.

22      131.   The Ordinance, as applied to the Terminal through the Resolution,

23  imposes burdens on interstate commerce that are impermissible under the

24

Commerce Clause.  U.S. Const. art. I, § 8, cl. 3.  The Ordinance burdens out-of-state miners, shippers, customers and carriers of coal and petcoke while protecting in-state interests by banning the transportation of coal and petcoke through the Terminal and simultaneously exempting from the ban local operations within Oakland that handle, store, and/or consume coal and petcoke.

132.   The justifications for the ban imposed by the Ordinance and Resolution and the purported benefits of the Ordinance and Resolution are illusory.  The Ordinance and Resolution impose a burden on interstate and foreign commerce, are clearly excessive in relation to the purported local benefits, are not based on evidence of a substantial danger to residents of Oakland and neighbors or users of the Terminal, and there are less restrictive measures that can and do control any fugitive dust emissions from the activities banned by the Ordinance and Resolution.

133.   As described herein, the passage of the Ordinance and Resolution have materially and substantially harmed OBOT, including by diminishing the value of OBOT's rights pursuant to the DA and diminishing the value of its investment in the West Gateway, imposing on OBOT substantial out-of-pocket costs to mitigate the harm from Oakland's unconstitutional exercise of its power, and interfering with OBOT's ability to attract partners and investments for the West Gateway project.

134.   OBOT therefore seeks declaratory and injunctive relief finding that the Ordinance and Resolution are unconstitutional under the Commerce Clause of the United States Constitution.

## SECOND CLAIM

### Preemption Under the ICCTA, the Hazardous Materials Transportation Act, and the Shipping Act of 1984

135.   OBOT realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 124, above.

136.   The Ordinance, as applied to the Terminal through the Resolution, is preempted by federal law.

137.   The Ordinance and Resolution are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), which vests the exclusive power to regulate rail transportation in the Surface and Transportation Board of the United States; the Hazardous Materials Transportation Act ("HMTA"), which vests the United States Secretary of Transportation with the authority to determine what materials warrant "hazardous" designations and restrictions or prohibitions in interstate and intrastate transportation; and the Shipping Act of 1984 which prohibits unreasonable discrimination against shippers, including by refusing to provide terminal services for reasons unrelated to transportation conditions.

138.   The ICCTA, 49 U.S.C. 10501 *et seq.*, preempts the Ordinance and Resolution.

139.   The ICCTA vests the Surface and Transportation Board ("STB") with exclusive jurisdiction over "transportation by rail carriers" and the operation of "spur, industrial, team, switching or side tracks, or facilities".  49 U.S.C. § 10501(b).

140.   The ICCTA further provides that the remedies provided under ICCTA "with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law".  49 U.S.C. § 10501(b)

– 34 –

141.    As set forth herein, the ICCTA preempts the Ordinance and Resolution because they impermissibly regulate services related to the movement of property by rail, including receipt, storage, handling, and interchange of property at the Terminal.

142.    The Ordinance and Resolution unjustifiably restrict and foreclose the foregoing activities by banning the loading, unloading, transloading, transferring, storage and/or other handling of coal or petcoke at the Terminal.

143.    The HMTA, 49 U.S.C. §§ 5101 *et seq.*, preempts the Ordinance and Resolution.

144.    The HMTA vests the United States Secretary of Transportation ("Secretary") with the exclusive authority to determine what materials warrant (and do not warrant) "hazardous material" designations and restrictions or prohibitions in interstate and intrastate transportation.

145.    49 U.S.C. § 5103 states that the Secretary shall designate materials as hazardous when the Secretary determines that transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property.

146.    49 U.S.C. § 5125 preempts states and political subdivisions of states from enacting any law or regulation that is an obstacle to accomplishing and carrying out the HMTA or regulations thereunder.

147.    49 U.S.C. § 5125 further preempts any regulation that is "not substantively the same" as any provision of the HMTA or regulations promulgated under its authority with respect to "the ***designation***, description, and classification of

1   hazardous material" and "the packing, repacking, **handling**, labeling, marking, and

2   placarding of hazardous material".  (emphasis added).

3      148.   The Secretary has not designated or classified coal as a hazardous

4   material that must be prohibited from interstate or intrastate transport.  The

5   Secretary has designated coal, along with other flammable solids like paper, wood,

6   and straw as materials that may require certain packaging, labelling and stowage

7   restrictions when shipped by marine vessel, but which do not present an

8   unreasonable risk of harm to health and safety when transported by rail and through

9   terminals.

10      149.   The Secretary has designated "Coke, Hot" as a hazardous material

11   forbidden from transport, 49 CFR 172.101, but otherwise has designated petcoke as

12   a material that is safe to transport in interstate (and intrastate) commerce without

13   unreasonable risk of harm to health or safety.

14      150.   In adopting the Ordinance and Resolution, Oakland has designated coal

15   and petcoke as materials that must be banned from transportation through the

16   Terminal because the City has determined that they pose a substantial risk to health

17   and safety.  By designating coal and petcoke as materials that present an

18   unreasonable risk to health and safety when transported in interstate commerce to

19   and through the Terminal, the Ordinance and Resolution usurp the exclusive

20   authority granted to the Secretary and are an obstacle to accomplishing and carrying

21   out the HMTA's goals of national uniform standards regarding the designation and

22   transportation of dangerous materials, and the HTMA's purpose of avoiding a

23   patchwork of state and local regulations.

24

151.   The Ordinance and Resolution are substantively different than the HMTA and regulations thereunder as to at least the designation, classification and/or handling of coal and petcoke.

152.   The Shipping Act of 1984, 46 U.S.C. §§ 40101, *et seq.*, preempts and/or otherwise prohibits the Ordinance and Resolution.

153.   The Shipping Act provides that a "marine terminal operator may not— (1) agree with another marine terminal operator or with a common carrier to boycott, or unreasonably discriminate in the provision of terminal services to, a common carrier or ocean tramp; (2) give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person; or (3) unreasonably refuse to deal or negotiate."  46 U.S.C. § 41106.

154.   The operator of the Terminal will be a marine terminal operator.  The Ordinance and Resolution preclude the operator of the Terminal from dealing with and providing terminal related services to shippers of coal and petcoke.

155.   It is unreasonable to refuse to provide terminal services for reasons unrelated to transportation conditions.  Transportation conditions include the transportation needs of the cargo, competition from other carriers, insufficient cargo to warrant service at a particular port, or conditions at a port or other facility that are beyond the carrier's control.  Transportation conditions do not include local regulations based on public policy.

156.   Based on the City's public policy against coal and petcoke, the Ordinance and Resolution require that operators of the Terminal refuse to provide terminal services to shippers of coal and petcoke.

157.   As described herein, transportation conditions cannot justify this discrimination against shippers that deal in coal and petcoke.

158.   The justifications for the ban imposed by the Ordinance and Resolution and the purported benefits of the Ordinance and Resolution are illusory.  The Ordinance and Resolution impose a burden on interstate and foreign commerce, are clearly excessive in relation to the purported local benefits, are not based on evidence of a substantial danger to residents of Oakland and neighbors or users of the Terminal, and there are less restrictive measures that can and do control any fugitive dust emissions from the activities banned by the Ordinance and Resolution.

159.   As described herein, the passage of the Ordinance and Resolution have materially and substantially harmed OBOT, including by diminishing the value of OBOT's rights pursuant to the DA and diminishing the value of its investment in the West Gateway, imposing on OBOT substantial out-of-pocket costs to mitigate the harm from Oakland's unconstitutional exercise of its power, and interfering with OBOT's ability to attract partners and investments for the West Gateway project.

160.   Based on the foregoing, OBOT seeks declaratory and injunctive relief finding that the Ordinance and Resolution, at least as applied to the Terminal, are preempted by federal law.

## THIRD CLAIM
### Breach of Contract

161.   OBOT realleges and reincorporates by reference the allegations set forth in paragraphs 1 through 124, above.

162.   In the DA, Oakland granted OBOT the vested right to develop and use (and/or sublease) the West Gateway property for a bulk commodities terminal subject to regulations existing as of the effective date of the DA, July 16, 2013.

163.    The adoption and enforcement of the Ordinance and Resolution breach the DA because section 3.4.2 of the DA permits the City to apply a health and safety regulation adopted after July 16, 2013, to the Terminal only if (a) the application of any such health and safety regulation is "otherwise permissible pursuant to Laws" ("Laws" being defined to include the Constitution of the United States, and any codes, statutes, regulations, or executive mandates thereunder), and (b) the regulation is based on substantial evidence of a substantial danger to health and safety.

164.   As set forth herein, the Ordinance and Resolution violate the United States Constitution and federal law.

165.   As set forth herein, the Ordinance and Resolution are not based on substantial evidence.

166.   The justifications for the ban imposed by the Ordinance and Resolution and the purported benefits of the Ordinance and Resolution are illusory.  The Ordinance and Resolution impose a burden on interstate and foreign commerce, are clearly excessive in relation to the purported local benefits, are not based on evidence of a substantial danger to residents of Oakland and neighbors or users of

– 39 –

1    the Terminal, and there are less restrictive measures that can and do control any

2    fugitive dust emissions from the activities banned by the Ordinance and Resolution.

3        167.   As described herein, the passage of the Ordinance and Resolution have

4    materially and substantially harmed OBOT, including by diminishing the value of

5    OBOT's rights pursuant to the DA and diminishing the value of its investment in the

6    West Gateway, imposing on OBOT substantial out-of-pocket costs to mitigate the

7    harm from Oakland's unconstitutional exercise of its power, and interfering with

8    OBOT's ability to attract partners and investments for the West Gateway project.

9                                **PRAYER FOR RELIEF**

10       WHEREFORE, OBOT respectfully prays that this Court:

11       A.     Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C.

12   § 1983, and/or Rule 57 of the Federal Rules of Civil Procedure, that:

13           i.    the Commerce Clause of the United States Constitution prohibits

14                 Oakland from applying the Ordinance and Resolution to OBOT or

15                 the Terminal;

16           ii.   the ICCTA preempts Oakland from applying the Ordinance and

17                 Resolution to OBOT or the Terminal;

18           iii.  the HMTA preempts Oakland from applying the Ordinance and

19                 Resolution to OBOT or the Terminal;

20           iv.   the Shipping Act of 1984 preempts and/or otherwise prohibits

21                 Oakland from applying the Ordinance and Resolution to OBOT or

22                 the Terminal; and

23

24

FIRST AMENDED COMPLAINT

1        v.      Section 3.4 of the DA prohibits Oakland from applying the

2                Ordinance and Resolution to OBOT or the Terminal.

3        B.      Issue a permanent injunction, pursuant to 28 U.S.C. § 1651, 42 U.S.C.

4   § 1983, and/or Rule 65 of the Federal Rules of Civil Procedure, enjoining Oakland

5   from applying or enforcing the Ordinance and Resolution to OBOT or the Terminal;

6        C.      Award reasonable attorneys' fees and costs; and

7        D.      Award such other legal or equitable relief available under the law that

8   may be considered appropriate under the circumstances in light of the City of

9   Oakland's above alleged misconduct, including relief prohibiting the City from

10  asserting that OBOT has breached the DA, the LDDA, and the Ground Lease for

11  West Gateway, dated February 16, 2016, by any failure to perform resulting from

12  the City's misconduct.

13

14  Dated:   June 14, 2017      Respectfully submitted,

15                              QUINN EMANUEL URQUHART &
16                              SULLIVAN, LLP

17                              By:     /s/ Robert P. Feldman
18                                      Robert P. Feldman

19                              *Attorneys for Plaintiff OBOT*

20

21

22

23

24

FIRST AMENDED COMPLAINT