QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert P. Feldman (Bar No. 69602)
  bobfeldman@quinnemanuel.com
  David Myre (Bar No. 304600)
  davidmyre@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Meredith M. Shaw (Bar No. 284089)
  meredithshaw@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6600

Attorneys for Plaintiff
OAKLAND BULK & OVERSIZED TERMINAL, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| OAKLAND BULK & OVERSIZED TERMINAL, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF OAKLAND,<br><br>Defendant. | Case No. 3:16-cv-07014-VC<br><br>**PLAINTIFF OAKLAND BULK & OVERSIZED TERMINAL, LLC'S TRIAL BRIEF**<br><br>Pretrial Conference:<br>January 10, 2018<br>Time: 10:00 a.m.<br>Ctrm.: No. 2, 15th Floor<br><br>Hon. Vince Chhabria |

Pursuant to the Court's Standing Order, Plaintiff Oakland Bulk & Oversized Terminal, LLC ("OBOT") respectfully submits this Trial Brief.

## INTRODUCTION

In 2016, the Oakland City Council passed an Ordinance banning the interstate rail transportation of coal and petcoke for export overseas through Oakland. That Ordinance is a textbook violation of the Dormant Commerce Clause of the U.S. Constitution and is preempted by three federal statutes: the Interstate Commerce Commission Termination Act ("ICCTA"), the Hazardous Materials Transportation Act ("HMTA"), and the Shipping Act of 1984 ("Shipping Act"). By also passing a Resolution specifically applying the Ordinance to the rail-to-ship terminal under development by OBOT at the former army base in Oakland, the City also breached its multi-million dollar development agreement ("DA") with OBOT, which granted OBOT the vested right to develop and operate a rail-to-ship terminal at the former army base subject only to the rules and regulations that existed when the DA was signed in 2013.

## BACKGROUND

### A. The Parties' Contractual Agreements

OBOT and the City of Oakland ("City") entered into a series of agreements, including a Development Agreement ("DA"), dated July 16, 2013. The DA vested in OBOT the right to develop, use, and operate for 66 years a "Bulk Oversized Terminal," defined in part as a "ship-to-rail terminal designed for the export of non-containerized bulk goods," at the portion of the former Oakland Army Base known as the "West Gateway," subject only to the rules and regulations that existed when the DA was signed.

In April 2014, OBOT entered into an exclusive negotiation agreement ("ENA") with Terminal and Logistics Solutions, LLC ("TLS") concerning the sublease and operation of the Terminal. TLS is a wholly owned subsidiary of Bowie Resources Partners, LLC ("Bowie"), a Kentucky company involved in the extraction and production of western bituminous coal. While the Terminal has always been planned as a multi-commodity bulk terminal, such terminals often require an "anchor tenant" to make the terminal financially feasible; Bowie's bituminous coal from Utah is currently the "anchor tenant."

### B.  Planned Operations at the Rail-to-Ship Terminal

The Terminal facilitates transportation of bulk goods carried by interstate rail to ships for export overseas. In particular, bituminous coal from Utah would be transported by interstate rail to the Terminal for export to foreign countries by ship. To get the coal from Utah onto the ships, Bowie contracts with a long-haul Class I rail carrier such as Union Pacific ("UP") or Burlington Northern Santa Fe ("BNSF"). Either UP or BNSF, or the short-line rail carrier Oakland Global Rail Enterprises, Inc. ("OGRE") on behalf of UP and BNSF (pursuant to contractual agreements), then performs "last-mile" rail service, bringing the rail cars to "dump pits," where OGRE then pulls "cuts" of the rail cars over the dump pits so the cars can be unloaded. After unloading the coal cars, OGRE reconnects the empty cars, air tests and inspects them, and then takes them back to the storage yard for UP or BNSF to carry back to the mine in Utah.

### C.  The Adoption of the Ordinance and Resolution Was a Pre-Ordained Process

Due at least in part to the influence of Intervenor Sierra Club, the possibility of coal at the Terminal eventually became politically unacceptable to the City Council. In June 2014, the Oakland City Council adopted a Resolution opposing the transportation of fossil fuel materials, including coal. Well aware of OBOT's vested rights to develop and operate a terminal subject only to regulations in place as of the execution of the 2013 DA—*i.e.*, when no coal or petcoke ban existed—the City ultimately attempted to fit a ban on the rail transportation of coal and petcoke for overseas export into a "health and safety" exception to OBOT's contractual right. Specifically, Section 3.4.2 of the DA provides that new laws or regulations may be applied to the Terminal if it is determined "based on substantial evidence and after a public hearing" that a failure to apply that regulation would result in a condition "substantially dangerous" to the health or safety of "occupants or users of the Project," or its "adjacent neighbors."

The City admits that at least two City Councilmembers made up their minds to ban coal in 2015—before any hearings on the Ordinance were even held. Because the City was already predisposed against any coal transport through the Terminal by late October 2015, the City Staff retained a consultant, Environmental Science Associates ("ESA"), to prepare a report supporting a

1  ban.[1]  As ESA wrote after a February 2016 City Council meeting, "all parties oppose [c]oal," and
2  "want an out-and-out ban, and now" rather than any "study, analysis, regulations, mitigation
3  measures, etc." that would "allow for the possibility that project [sic] will proceed with some
4  conditions or mitigations."  The City thus directed ESA to provide a bare bones study.

5  Although the Ordinance proclaimed that ESA's work was an "independent evaluation," the
6  City Staff and the City's attorneys—including trial counsel in this matter—actively directed
7  ESA's work.  At least twice the City edited drafts of the "independent" ESA report.  City Staff
8  also requested that certain positions be taken in the report—for example, because of concerns
9  about federal preemption or air quality issues.

10  On Friday, June 24, 2016, the City Council received the 163-page ESA Report, a 25-page
11  City Staff Report, as well as the draft Ordinance and Resolution.  The City Council then met on
12  Monday, June 27, 2016 to enact the coal and petcoke ban.  The City Council made no changes to
13  the draft Resolution and Ordinance that had been forwarded to the City Council by the City Staff
14  on June 24, 2016, including no changes to the "findings" the City Council supposedly made on
15  June 27, 2016.  The City Council passed the Ordinance, purporting to establish a citywide "ban on
16  the storage, loading, unloading, stockpiling, transloading and handling" of coal and petcoke at
17  "Bulk Material Facilities" in Oakland.  The Ordinance, however, exempts "non-commercial
18  facilities" and "manufacturing facilities" that are not engaged in interstate or foreign commerce.

### DISCUSSION

20  OBOT will prove at trial that the Ordinance violates the Dormant Commerce Clause, and
21  is preempted by ICCTA, the HMTA, and the Shipping Act; OBOT will also prove that the City
22  breached the DA by applying the Ordinance to the Terminal via the Resolution.

---

[1] At a May 3, 2016 City Council meeting where the Council voted to retain ESA, a third City Council member (Noel Gallo) joined the two Council members who had already made up their minds against coal.  Almost simultaneously, a fourth City Council member—Abel Guillen—posted a picture on Instagram of himself holding a sign that said:  "NO COAL IN OAKLAND!"  Thus, at least four of the eight Council members who later voted on the Ordinance had already decided to ban coal before ESA even began its work, and ESA's two 30(b)(6) witnesses admitted they knew the City Council wanted a report from ESA that would sustain a ban on coal.

-3-

## I.     THE ORDINANCE VIOLATES THE DORMANT COMMERCE CLAUSE

The Ordinance violates the Dormant Commerce Clause ("DCC"), whether analyzed under the per se or balancing prongs of the DCC analysis.

### A.     Per Se Violation of the Dormant Commerce Clause

*First*, the Ordinance is a per se violation of the Dormant Commerce Clause because it directly regulates interstate and foreign commerce. The Ordinance is ***not*** a law of general application that "regulates evenhandedly" across all activities in Oakland and thereby has only "indirect effects on interstate commerce." *E.g.*, *S.D. Myers, Inc. v. City & Cnty. of S.F.*, 253 F.3d 461, 466-67 (9th Cir. 2001). To the contrary, the City has admitted that the Ordinance is directed at blocking the interstate transportation of coal and petcoke for export overseas. Where, as here, a state or local law "is directed at interstate [or foreign] commerce and only interstate [or foreign] commerce," it is a per se violation of the Dormant Commerce Clause. *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993).[2]

*Second*, the Ordinance is separately a per se violation of the Dormant Commerce Clause because it discriminates against interstate and foreign commerce in favor of local interests. The Ordinance "overtly blocks the flow of interstate commerce [in coal and petcoke] at [Oakland's] borders," *Pittston Warehouse Corp. v. City of Rochester*, 528 F. Supp. 653, 660 (W.D.N.Y. 1981), while permitting local facilities that do not transport coal or petcoke in interstate and foreign commerce to store, handle, load and unload coal. The net effect of the Ordinance, therefore, is that the City has banned interstate and foreign commerce in coal, while protecting local interests from the adverse consequences of the ban—a blatant form of economic protectionism that

---

[2] *See also Pa. v. W. Va.*, 262 U.S. 553, 596-97 (1923) ("Natural gas is a lawful article of commerce . . . . A state law . . . which by its necessary operation prevents, obstructs, or burdens such transmission is a regulation of interstate commerce—a prohibited interference."); *West v. Kan. Natural Gas Co.*, 221 U.S. 229, 249 (1911) (statute effectively prohibiting export of natural gas unconstitutional under Dormant Commerce Clause because "to prohibit interstate commerce is more than to indirectly affect it"); *Bowman v. Chi. & Nw. R.R. Co.*, 125 U.S. 465, 497 (1888) (Iowa statute obstructing rail transportation of liquor is an unconstitutional "regulation directly affecting interstate commerce").

infringes Congress's latent authority under the Commerce Clause. *See Pac. Merch. Shipping v. Goldstene*, 639 F.3d 1154, 1177 (9th Cir. 2011).

### B. Undue Burden on Interstate and Foreign Commerce

Even if the Ordinance were not a per se violation of the Dormant Commerce Clause (it is), it would still violate the Dormant Commerce Clause because the burden it imposes on interstate and foreign commerce outweighs any purported local benefit. Where a state or local law undermines uniformity of regulation in a system of interstate commerce—such as the national freight railroad system—it places an unconstitutional burden on interstate commerce that clearly outweighs any purported justification. *See, e.g.*, *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 870-72 (9th Cir. 2003). As long as the Ordinance is in place, any interstate train carrying cargo for export through Oakland will be required to conform its cargo to the Ordinance at its out-of-state point of origin—or divert its course to avoid Oakland altogether—because coal and petcoke cannot be unloaded, transferred to a ship (or even from one rail car to another), or stored in a rail car for a matter of minutes in Oakland—as the City has conceded. *See id.* at 871. If each city across the country connected to the national railroad system could dictate which lawful articles of commerce can and cannot be transferred or otherwise handled at rail-served terminals within its borders, the "vast and integrated" national rail system would become wholly unworkable. *See id.* at 871-72. In addition, the local health and safety benefits the City contends are achieved by this ban are illusory and cannot outweigh the burden of a complete ban on the interstate rail transportation of coal and petcoke for export overseas through Oakland.

## II. THE ORDINANCE IS PREEMPTED

### A. ICCTA Preemption

The Ordinance is preempted by ICCTA, 49 U.S.C. §§ 10101 *et seq.*, which grants exclusive jurisdiction to the United States Surface Transportation Board ("STB") to regulate "transportation by rail carrier," and preempts "all state laws that may reasonably be said to have the effect of managing or governing rail transportation." *See* 49 U.S.C. § 10501(a), (b); *Or. Coast Scenic R.R. v. Or. Dep't of State Lands*, 841 F.3d 1069, 1073 (9th Cir. 2016). The Ordinance plainly regulates—and has "the effect of managing and governing"—transportation by rail carrier

-5-

because it prohibits the handling, unloading, delivery, and temporary storage of coal and petcoke by rail carriers (including long-haul Class I carriers like UP and BNSF and short-line rail carrier OGRE, and their agents) along rail lines connecting out of state mines to ships contracted to carry that coal and petcoke to foreign ports.  *See* 49 U.S.C. §§ 10102(9)(A)-(B).  Further, Section 10501(b) expressly grants the STB exclusive jurisdiction over "operation … of spur, … switching, or side tracks, or facilities," 49 U.S.C. § 10501(b)(2), and the Ordinance indisputably affects operations of spur or switching tracks and facilities at the Terminal.

### B. HMTA Preemption

The Secretary of Transportation has determined that coal and petcoke are *not* hazardous materials that present a danger too great to transport by rail.  *See* 49 C.F.R. § 172.101.  In enacting the Ordinance, however, the City declared that transporting coal and petcoke by rail "create[s] conditions substantially dangerous to the health and/or safety" of persons in Oakland such that it needs to be banned.  Ordinance at § 8.60.020(B)(1)(d).  The Ordinance, therefore, is preempted by the HMTA.  *See* 49 U.S.C. § 5125(b)(1)(A) (any state or local law "that is not substantively the same" as any provision of the HMTA, or regulations prescribed under the HMTA, is preempted if it involves "the designation, description, [or] classification of hazardous material").

### C. Shipping Act Preemption

Because the Ordinance requires any operator of the Terminal to refuse to provide terminal services on a basis other than "transportation conditions" (*i.e.*, on the basis of the goods sought to be transported—coal and petcoke), it forces discrimination in violation of 46 U.S.C. § 41106(1), and is accordingly preempted by the Shipping Act.  *See Reed v. City & Cnty. of S.F.*, 10 Cal.App.4th 572, 574 (Cal. Ct. App. 1992).

### III. THE CITY BREACHED THE DEVELOPMENT AGREEMENT

The City's application of the Ordinance to OBOT through the Resolution also breached the DA.  The DA permits new laws or regulations to be applied to the Terminal only if it is determined, "based on substantial evidence and after a public hearing," that a failure to apply the new regulation would result in a condition "substantially dangerous" to the health or safety of "occupants or users of the Project," or its "adjacent neighbors."  DA at § 3.4.2.  Any such new law

-6-

or regulation may impair a vested right only if the law or regulation is "necessary" to prevent a "menace to the public health and safety." *Stewart Enterprises, Inc. v. City of Oakland*, 248 Cal. App. 4th 410, 420-23 (2016); *Davidson v. Cty. of San Diego*, 49 Cal. App. 4th 639, 648-49 (1996). The City applied the Ordinance to the Terminal without "substantial evidence" of any local health and safety menace, as required to permit an exception to OBOT's valuable vested rights under the DA.

### A. Pre-Existing Laws Will Prevent Any Substantial Danger

#### 1. BAAQMD Permitting Requirements Will Prevent a Substantial Danger To Air Quality

The Ordinance and Resolution both contain a purported finding that "pre-existing local, state and/or federal laws are inapplicable and/or insufficient to protect and promote the health, safety and/or general welfare" of Oakland "Constituents." This "finding" is insufficient to satisfy Section 3.4.2 for at least two reasons. *First*, the finding is unsupported by any, much less substantial evidence, all of which is to the contrary. *Second*, while this finding might support the application of the Ordinance to "facilities" without OBOT's vested rights (if there were any such facilities), it fails to address, much less satisfy, the "substantial danger" test in Section 3.4.2.

Any substantially dangerous air quality condition would be prevented by the Bay Area Air Quality Management District's ("BAAQMD") permitting requirements. OBOT must obtain an Authority to Construct and Permit to Operate ("BAAQMD Permit") before it may construct, operate and continue to operate the Terminal. The City's 30(b)(6) witness, Claudia Cappio, testified she "ha[s] [no] reason to think that BAAQMD would enforce EPA standards in a way that permitted a substantial danger to people in the City of Oakland," Dkt. 141-27 (Cappio Tr.) at 273:1-12, and, likewise, she never "reach[ed] a determination that BAAQMD's rules and regulations were inadequate to ensure adequate air quality with respect to the OBOT terminal." *Id*. at 180:18-23. ESA's testimony is to the same effect. *See* Evans Tr. at 56:4-11. Moreover, the Ordinance itself demonstrates that a BAAQMD permit protects against a substantial danger. The Ordinance expressly exempts from its scope "on-site manufacturing facilities" *in Oakland* that "consume" (*e.g.*, burn) coal or coke so long as they are operated pursuant to "permits granted by

the [BAAQMD]."

### 2. OSHA and Cal/OSHA Worker Safety Regulations Will Prevent a Substantial Danger to Workers

The Ordinance included a finding, incorporated into the Resolution, that "[w]orkers would be closest to the fugitive coal dust and respirable fine particulates during transport and staging of loaded cars for unloading and within the enclosed facilities." Dkt. 141-1 (Ordinance) at § 8.60.020(B)(1)(d). The City failed to make any findings, however, that existing regulations of applicable agencies, including the federal Occupational Safety and Health Administration ("OSHA") and Cal/OSHA, would be insufficient to protect workers from a "substantially dangerous" condition at the Terminal.

### 3. Pre-Existing Fire Safety Measures Will Prevent a Substantial Fire Danger

Similarly, the City failed to support its "findings" regarding the potential dangers of coal fire, and pre-existing fire safety measures would protect against any potential substantial fire danger. The Oakland Fire Department ("OFD") stated that bituminous coal is ranked at the "lowest,"—*i.e.*, the safest—level of the various commodities that could be shipped through the Terminal. Dkt. 141-27 (Cappio Tr.) at 163:11-164:10. And while the ESA Report claims there is a "track record of fires occurring in coal cars and at coal terminals," ESA's subcontractor who authored the Report's fire safety section stated that "[m]ajor fires at coal terminals are not common or widespread." Dkt. 141-60 (6/15/16 Internal ESA Email) at ESA_036704. OFD never suggested during discussions between the City and OBOT that a "ban" on coal was necessary due to firefighting concerns, and, likewise, the ESA Report noted that specialized training to respond to the unique dangers of coal combustion is available, *see* Dkt. 141-45 (ESA Report) at ES-5, demonstrating that fire-fighting at a coal terminal is entirely feasible.

In sum, the City cannot demonstrate that a complete ban on the shipment of coal and petcoke through the Terminal is *necessary* to prevent a condition "substantially dangerous" to the health or safety of "occupants or users of the Project," or its "adjacent neighbors" sufficient to activate an exception to OBOT's vested rights. Indeed, everyone from the local air quality regulators to the Oakland fire department agrees that pre-existing health and safety regulations of

-8-

general application are sufficient to protect the occupants and neighbors of the project from whatever risks, if any, could be presented by a Terminal that handles coal and petcoke.

### B.   The City's Determinations Were Premature

For several reasons the City's determinations were premature.  For example, the Basis of Design on which the ESA Report was based was a conceptual description of aspects of the Terminal, which has not yet been designed, and thus afforded no basis to evaluate the project.  The ESA Report expressly states that "[t]his study is based upon a *screening level review* of the preliminary [Basis of Design] for the Terminal."  Dkt. 141-45 (ESA Report) at 2-1 (emphasis added).  ESA's 30(b)(6) witness agreed that "screening level review" means "a preliminary review based on limited information."  Dkt. 141-33 at 6-7.

### C.   The City Did Not Satisfy The DA's "After A Public Hearing" Requirement

The City separately failed to meet Section 3.4.2's requirement that any determination to apply a new regulation to the Terminal be made "after a public hearing."  A public hearing "contemplates a fair and impartial hearing at which competent evidence may be presented before a fair and impartial tribunal." *Saks & Co. v. City of Beverly Hills*, 107 Cal.App.2d 260, 265 (1951), *disapproved of on other grounds by City of Fairfield v. Superior Ct.*, 14 Cal.3d 768, 781-81 (1975).  Here, however, the result was preordained.  The majority of the Councilmembers who voted in favor of the Ordinance and Resolution had made up their mind to ban coal before—not after—the June 27, 2016 hearing, contrary to the requirement in Section 3.4.2 of the DA.  Moreover, it is undisputed that, prior to June 24, the City Council had not even seen the Ordinance and Resolution or any of the other materials that were disclosed on June 24, including the ESA Report, and this timing certainly permitted no occasion for meaningful review of these materials.

-9-

## CONCLUSION

For these reasons, OBOT will establish at trial that the Ordinance is unconstitutional and preempted, and also that the City breached the DA.

Dated: January 3, 2018

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Robert P. Feldman*

Robert P. Feldman

Attorney for Plaintiff